**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com

**BURSOR & FISHER, P.A.**
Yitzchak Kopel (*pro hac vice*)
1330 Avenue of the Americas,
32nd Floor New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: ykopel@bursor.com

*Attorney for Plaintiff*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JACOB KELLER, individually and on behalf of all other persons similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>UDR, INC.,<br><br>Defendant. | Case No. 3:26-cv-03865-AJB-MMP<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

PAGE(S)

NATURE OF THE ACTION ..... 1
JURISDICTION AND VENUE ..... 1
THE PARTIES ..... 2
FACTUAL ALLEGATIONS ..... 3
I. The San Diego Municipal Code Makes It Unlawful To Use Algorithmic Devices to Set Rental Rates or Occupancy Levels ..... 3
II. RealPage's Market Analytics ..... 5
A. Market Analytics Performs Calculations of Nonpublic Competitor Data ..... 6
B. Market Analytics Uses Algorithms To Perform Those Calculations ..... 11
C. The Data Concerns Local Rents and Occupancy Levels ..... 13
D. Market Analytics Advises Landlords on the Rent They May Obtain ..... 14
E. Market Analytics Was Designed for Property Managers and Owners Like Defendant ..... 19
III. UDR Investor Materials Show It Used Axiometrics ..... 22
IV. Defendant Admits It Used RealPage Software ..... 22
V. The Use of Algorithmic Devices to Set Rents or Occupancy Levels Harms San Diego Tenants ..... 23
CLASS ALLEGATIONS ..... 26
CAUSES OF ACTION ..... 28
PRAYER FOR RELIEF ..... 30
DEMAND FOR JURY TRIAL ..... 30

Plaintiff Jacob Keller ("Plaintiff"), by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge, against UDR, Inc. ("UDR" or "Defendant").

## NATURE OF THE ACTION

1. San Diego Mun. Code § 98.1103 makes it "unlawful for a person to sell, license, or otherwise provide an algorithmic device to a landlord[,]" and makes it "unlawful for a landlord to use an algorithmic device to set rental rates or occupancy levels for residential rental property."

2. In other words, it is illegal for a landlord to use software that performs calculations using nonpublic competitor data to advise the landlord on rental prices or how many units to rent.

3. Despite this clear mandate, Defendant is a landlord who uses an algorithmic device to set rental rates or occupancy levels for residential rental property in San Diego.

4. Under San Diego Mun. Code § 98.1104(a), "[a] tenant may seek injunctive relief, damages, or civil penalties of up to $1,000 per violation of this Division, in a civil action against a landlord."

5. Thus, pursuant to Federal Rule of Civil Procedure 23, Plaintiff brings this action, on behalf of himself and all others similarly situated, to redress Defendant's violations of San Diego Mun. Code § 98.1103.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action where there are more than 100 members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one member of the putative Class is a citizen of a state

different from Defendant.

7. The Court has personal jurisdiction over Defendant because Defendant has purposefully directed its activities at forum residents, has purposefully derived benefit from these forum activities, and has purposefully availed themselves of the privilege of conducting activities within the forum. Defendant conducts substantial business in this District by operating and/or managing multiple rental residential properties in this District, including the multifamily rental property that Plaintiff resides in. Defendant has, at all times relevant hereto, systematically and continually conducted, and continues to conduct, business in California, including within this District. Defendant has intentionally availed itself of the benefits and privileges of the California and San Diego rental market specifically, and has profited therefrom. Thus, Defendant has "certain minimum contacts" with California such that exercising personal jurisdiction over Defendant would not "offend traditional notions of fair play and substantial justice." *Calder v. Jones*, 465 U.S. 783, 788 (1984).

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the events giving rise to this action occurred in this District.

## **THE PARTIES**

9. Plaintiff Jacob Keller is an adult citizen of the state of California and is domiciled in San Diego, California.

10. Plaintiff Keller is a tenant at a UDR-managed residential rental property in San Diego, California. Plaintiff entered this lease in or around May 2025 and began in or around June 2025.

11. Defendant UDR, Inc. ("UDR") is a Maryland corporation with its principal place of business in Highlands Ranch, Colorado. At all times material to this Complaint, UDR and/or an affiliated entity manage(s), own(s), and operate(s) residential rental units in residential buildings in this District and throughout the United States.

12. UDR manages the residential rental property in which Plaintiff lives.

## FACTUAL ALLEGATIONS

### I. The San Diego Municipal Code Makes It Unlawful To Use Algorithmic Devices to Set Rental Rates or Occupancy Levels

13. On May 22, 2025, San Diego passed an ordinance amending the Municipal Code, to make it unlawful for landlords to use an algorithmic device to set rental rates or occupancy levels for residential rental property.

14. San Diego Mun. Code § 98.1103(b) provides:

> It is unlawful for a *landlord* to use an *algorithmic device* to set rental rates or occupancy levels for *residential rental property*.

(Emphasis in original).

15. "Algorithmic device" means:

> [A] software or product that uses or incorporates one or more algorithms to perform calculations of *nonpublic competitor data* of two or more *landlords* to advise a *landlord* on, or recommend to a *landlord*, rental rates or occupancy levels that may be achieved for a *residential rental property* in the City of San Diego.

San Diego Mun. Code § 98.1102 (emphasis in original).

16. "Nonpublic competitor data" means:

> [I]nformation that is not available to the general public, whether the information is attributable to a specific competitor or anonymized or whether the information is derived from or otherwise provided by another *person*. *Nonpublic competitor data* includes information about actual rental rates, rental rate changes, *residential rental property* supply levels, occupancy levels, or *lease* start and end dates.

San Diego Mun. Code § 98.1102 (emphasis in original).

17. The Ordinance became effective June 21, 2025.[1]

18. The legislature enacted this ordinance to protect San Diego tenants' rights, and the local rental housing market in San Diego, from large corporate landlords like Defendant whose "use of algorithmic devices" has "resulted in inflated rental rates and unfair rent increases and contributed to the City's unaffordability for families":

> The high cost of living and housing shortage in the City of San Diego (City) have contributed to the City's unaffordability. According to a March 2024 Zillow report, a family must earn $275,000 a year to afford a home mortgage. According to an August 4, 2024, Times of San Diego article, the average rental rate for a two-bedroom residential dwelling unit in the City is $2,489, almost 65% higher than the national median.
>
> Landlords' use of algorithmic devices, which perform calculations of nonpublic competitor data concerning rental rates, occupancy levels, and other information, to set rental rates and occupancy levels has resulted in inflated rental rates and unfair rent increases and contributed to the City's unaffordability for families.
>
> …
>
> [S]oftware companies, such as RealPage, Inc., continue providing algorithmic devices to landlords in the City.[2]

19. The legislature noted that "[i]n response to the use of algorithmic devices to set rental rates and occupancy levels, in August 2024, the United States Department of Justice (DOJ) filed a lawsuit"[3] against RealPage and amended its lawsuit to name large corporate landlords.

---

[1] Ord. No. O-21955, App. 05/22/2025, Eff. 06/21/2025, available at https://docs.sandiego.gov/council_reso_ordinance/rao2025/O-21955.pdf.

[2] Ord. No. O-21955, App. 05/22/2025, Eff. 06/21/2025, at 1-2, available at https://docs.sandiego.gov/council_reso_ordinance/rao2025/O-21955.pdf.

[3] *Id.*

20. "Eight Attorneys General, including California Attorney General Rob Bonta, joined the DOJ's lawsuit."[4] Indeed, Defendant UDR, Inc. was a large corporate landlord named in an antitrust lawsuit.[5] Nevertheless, the legislature passed the ordinance to provide "immediate relief" for San Diego tenants:

> While the litigation is pending, software companies, such as RealPage, Inc., continue providing algorithmic devices to landlords in the City. City families cannot wait for the DOJ lawsuit to run its course and, if successful, provide relief from inflated rental rates and unfair rent increases. The Council wishes to provide immediate relief to City families by prohibiting the sale, licensing, and use of algorithmic devices that use or incorporate nonpublic competitor data of two or more landlords to advise a landlord on, or recommend to a landlord, rental rates or occupancy levels that may be achieved for residential rental property in the City.[6]

## II. RealPage's Market Analytics

21. RealPage, Inc. ("RealPage") is an enterprise resource planning software company that offers more than traditional property management services. RealPage "licenses [various] revenue management products to property management companies and property owners (collectively, 'landlords')[.]"[7]

---

[4] *Id.*

[5] *See* First Amended Compl., *District of Columbia vs. RealPage, Inc. et al.*, No. 2023-CAB-006762, (D.C. Super. Ct. Jan. 10, 2025).

[6] *Supra* note 1.

[7] DOJ Antitrust Division, NOTICE PURSUANT TO THE ANTITRUST PROCEDURES AND PENALTIES ACT, *United States et al. v. RealPage, Inc. et al. Response to Public Comments*, available at https://www.federalregister.gov/documents/2026/05/08/2026-09147/united-states-et-al-v-realpage-inc-et-al-response-to-public-comments.

22. As relevant here, RealPage's software products include "Market Analytics."[8]

23. Because Market Analytics uses algorithms to perform calculations of nonpublic competitor data, including information about actual rent rates, rental rate changes, residential rental property supply levels, occupancy levels, or lease start and end dates, and advises landlords on the occupancy and rent that may be achieved, it is an "algorithmic device."

24. Defendant uses Market Analytics to advise on the occupancy and rent that may be achieved with respect to Plaintiff.

**A. Market Analytics Performs Calculations of Nonpublic Competitor Data**

25. RealPage Market Analytics performs calculations of nonpublic competitor data. As shown by the image below, RealPage boasts that "ONLY REALPAGE MARKET ANALYTICS PROVIDES 100% VISIBILITY[.]"

26. RealPage explains that while the "public" only sees "Asking Rents" and "Vacancy"—which is just 5% of the information that is available—"Market Analytics" allows its customers in San Francisco to "SEE THE 95% YOU'VE BEEN MISSING[.]" This "95%" is based on information that is not available to the general public, including information about actual rent rates, rental rate changes, residential rental property supply levels, occupancy levels, or lease start and end dates:

///

///

///

///

---

[8] RealPage also licenses algorithmic software products including "AI Revenue Management ('AIRM'), YieldStar, and Lease Rent Options ('LRO')." Plaintiff does not base the claim pleaded herein on those products.




*Image taken from RealPage Market Analytics flyer*

*https://www.realpage.com/storage/files/pages/covid-19-resources/pdf/c19-aso-18-152-011-marketanalyticscampaign-flyer.pdf*

27. RealPage goes on to explain:

> Data based on rents and occupancy shows less than 5% of a property's true performance. But with RealPage Market Analytics, you can compare new lease rent growth to renewals by market or submarket and see retention rates, lease terms, average vacant days and other key insights — sourced from real-time data on over 13 million units across 400+ markets.[9]

28. This data comes from competitors' rent rolls. RealPage's same marketing material[10] boasts:

> • [O]nly one solution provides true visibility sourced from **actual rent rolls**. RealPage® Market Analytics is the industry's only transaction-driven research platform that provides complete visibility[.]

[9] https://www.realpage.com/storage/files/pages/covid-19-resources/pdf/c19-aso-18-152-011-marketanalyticscampaign-flyer.pdf.

[10] *Id.*

- True Transaction Data – Access **true submarket performance data from actual rent rolls** to reduce risk and drive decision-making
- Expansive Rent Comps – Dig deeper with **rent detail down to the floorplan level** with extended history

29. RealPage's then-VP Asset Optimization, Jay Parsons, in a video discussing Market Analytics, said: "**Lease transaction data, this is really the big deal**."[11] He explains that transactional information is "**data coming directly out of actual rent rolls**. This is the same data you are running your businesses off of. …. **This is what's on the books. This is the real data** …."[12]




*Image taken from RealPage Market Analytics video*
*https://www.realpage.com/videos/next-generation-apartment-market-research/*

[11] RealPage, *See the Next Generation of Apartment Market Research*, at [07:39-07:42], available at https://www.realpage.com/videos/next-generation-apartment-market-research/.

[12] RealPage, *See the Next Generation of Apartment Market Research*, at [08:10-08:49], available at https://www.realpage.com/videos/next-generation-apartment-market-research/.

30. RealPage conceded on its publicly available website that "RealPage Market Analytics integrates RealPage's proprietary historical apartment data,"[13] among other data:

> **Frequently Asked Questions**
>
> **What is RealPage Market Analytics?** +
>
> **What are the benefits of using the Market Analytics solution from RealPage?** +
>
> **What data sources does RealPage Market Analytics utilize?** –
>
> RealPage Market Analytics integrates RealPage's proprietary historical apartment data, publicly available unit-level data (updated daily), MSCI Real Capital Analytics' sales transaction data, and precise econometric modeling to provide comprehensive market intelligence.

31. RealPage admitted the Market Analytics platform allows access to: "**Proprietary** apartment data covering millions of units across 425+ markets[.]"[14]

> **No other multifamily market research platform has our data resources:**
>
> Proprietary apartment data covering millions of units across 425+ markets
>
> MSCI Real Capital Analytics sales data covering $2.9T in MF transactions over 25 years
>
> Historical apartment data spanning 30+ years and multiple market cycles

32. Market Analytics provides information that was not previously available, such as "Lease Terms[.]"

33. Prior to Market Analytics, RealPage could not see what rent tenants actually agreed to pay or how long their leases actually lasted. That information is not available online. A single number posted online represents the rent in the abstract, but the rent a tenant actually pays depends on the day the tenant moves in, the day the tenant moves out, and the length of the lease the tenant signs. The posted number

---

[13] REALPAGE, MARKET ANALYTICS, Frequently Asked Questions, https://www.realpage.com/insights-analytics/market-analytics/ (last accessed June 29, 2026).

[14] REALPAGE, MARKET ANALYTICS, https://www.realpage.com/insights-analytics/market-analytics/ (last accessed May 14, 2026) (emphasis added).

therefore says little about real rents. Only the signed leases themselves, recorded in each landlord's internal rent roll, show what tenants are actually paying and for how long. According to RealPage, Market Analytics provided that visibility for the first time:

> We [RealPage] had nothing about lease term lengths … lease terms have become incredibly disparate. …. There is no such thing as a standard twelve-month lease anymore. Now, you have a pricing matrix, … the number online is almost meaningless, because the rent can vary based on what day you want to move in, when you want to move out, and so that's resulted in very disparate lease terms. So that is an important piece of context as well. What percent of … leases are being renewed and at what rate. And of course, what are leases actually being signed for? …. We never had visibility into rent roll movement until now.[15]

34. Per Justin Alanis: "RealPage represents the only company in the industry that can deliver this type of information to their customers."[16]

35. Per Jay Parsons, with Market Analytics, RealPage "can show you … the same level of detail you have from your own portfolio, you can now see that same context … on the outside as well, regardless of if you are in that submarket or not."[17]

///

///

///

///

---

[15] RealPage, *See the Next Generation of Apartment Market Research*, at [10:15-10:58], available at https://www.realpage.com/videos/next-generation-apartment-market-research/.

[16] RealPage, *See the Next Generation of Apartment Market Research*, at [11:28-11:32], available at https://www.realpage.com/videos/next-generation-apartment-market-research/.

[17] RealPage, *See the Next Generation of Apartment Market Research*, at [09:37-09:48], available at https://www.realpage.com/videos/next-generation-apartment-market-research/.




*Image taken from RealPage Market Analytics video*
*https://www.realpage.com/videos/next-generation-apartment-market-research/*

### B. Market Analytics Uses Algorithms To Perform Those Calculations

36. Market Analytics is "[p]owered by Lumina AI" to provide "daily updates on **rents**, concessions, floor plans, and **occupancy**—helping teams turn data into actionable insights."[18]

///

///

///

///

///

///

///

///

---

[18] REALPAGE, MARKET ANALYTICS, https://www.realpage.com/insights-analytics/market-analytics/ (last accessed May 14, 2026).




37. In addition to Market Analytics providing "AI [Artificial Intelligence] Forecasting," the Market Analytics software uses algorithms.

38. In 2019 according to RealPage's then-Senior Vice President of Market Analytics, Justin Alanis, through Market Analytics, by "using this underlying transaction data … [RealPage] can use it for underlying machine learning and data science projects as well … and look into the future for our customers as well."[19]

39. Asset Intelligence is a tool that has been "fully integrated within Market Analytics."[20] "This powerful new tool is the first of its kind to provide to deliver …. true comps for rent" among other features. "Asset Intelligence provides a

---

[19] RealPage, *See the Next Generation of Apartment Market Research*, at [12:58-13:10], available at https://www.realpage.com/videos/next-generation-apartment-market-research/.

[20] Video describing Market Analytics available on realpage.com/insights-analytics/market/-analytics/ as of Sep. 2, 2026.

comprehensive view into … performance at the property, submarket, and market levels."[21]




*Image taken from RealPage Market Analytics video*
*realpage.com/insights-analytics/market/-analytics/*

### C. The Data Concerns Local Rents and Occupancy Levels

40. RealPage boasts that the "proprietary" data available to landlords through this algorithmic software "makes it easy to gain … niche level granularity, … and other key insights powering comprehensive multifamily trends."[22] This data is provided to landlords in real-time:

> Asset Intelligence delivers instant, data-driven insights … and reduces analysis time from hours to seconds. It enhances organizational effectiveness by providing ***granular** … **rent comparisons***, … and highly configurable comp and assumption analysis.[23]

41. RealPage's Jay Parsons says: "We have much more granular submarkets now[.]" Jay Parsons also explains that "one of the great things we now have, … are really the only datasets that go back multiple decades[.]"[24]

42. RealPage's Jay Parsons explains: "At submarket level it's updated every single month. Our benchmarking product is updated every single day."[25]

---

[21] *Id.*

[22] RealPage, Market Analytics, https://www.realpage.com/insights-analytics/market-analytics/ (last accessed May 14, 2026).

[23] *Id.* (emphasis added).

[24] RealPage, *See the Next Generation of Apartment Market Research*, at [04:23-05:00], available at https://www.realpage.com/videos/next-generation-apartment-market-research/.

[25] *Id.* at [26:13-26:18].

43. Other lease transaction data available (aggregated at the "submarket level," with a minimum of 5 properties) include but are not limited to: "average vacant days, lease term lengths, renter income was a big one … not just census data incomes but what are the incomes for renters actually signing the leases. … There is a number of metrics."[26]

44. RealPage's Justin Alanis also explained that: "The continuing property-level data is … updated monthly on the fifth day of the month … but the lease-transaction data happens nightly. And that flows through the platform, and that's meant to give you a real time view … on all those different metrics that Jay [Parsons] talked about."[27]

**D. Market Analytics Advises Landlords on the Rent They May Obtain**

45. "Rent benchmarking involves comparing rental rates of similar properties within a specific area. This process allows landlords to identify what their properties should command in rent based on several core factors, such as location, amenities, and market demand. By leveraging data analytics and local market trends, landlords can enhance their pricing strategies, ensuring they remain competitive while maximizing returns."[28]

46. "Market Analytics is the multifamily industry's leading intelligence platform for market-rate, student housing, and Build-to-Rent communities …. [I]t delivers clear visibility into market, submarket, and asset performance with daily

---

[26] RealPage, *See the Next Generation of Apartment Market Research*, at [26:34-26:48], available at https://www.realpage.com/videos/next-generation-apartment-market-research/.

[27] RealPage, *See the Next Generation of Apartment Market Research*, at [27:28-27:51], available at https://www.realpage.com/videos/next-generation-apartment-market-research/.

[28] https://iconicpm.com/glossary/how-can-rent-benchmarking-benefit-landlords-in-fluctuating-markets/.

updates on rents, concessions, floor plans, and occupancy—helping teams turn data into actionable insights."[29]

47. This information based on actual transactional data is important to RealPage because, per Jay Parsons, "no one is going to have an asking rent available for a unit that is already leased."[30] He further explains that "asking rent" is only changed "in response to other things happening." For example, "units sitting vacant longer, …. longer term leases being accepted in exchange for a lower average monthly rent …. The asking rent is really a lagging indicator, and now these leading indicators [Market Analytics provides] … at a submarket level updated every single month. So that's a big deal."[31]

48. For example, a testimonial in RealPage marketing materials says: "Lease transactional data is now firmly rooted in our business practices from underwriting to asset management **to property management**[.]"[32]

49. As explained by RealPage's Justin Alanis, in describing Market Analytics, noted that there was a "discrete need" to "start to think about cleaning up … the user interface, user experience, and also thinking how we can establish more robust and better data through the platform."[33]

---

[29] REALPAGE, MARKET ANALYTICS, https://www.realpage.com/insights-analytics/market-analytics/ (last accessed May 14, 2026).

[30] RealPage, *See the Next Generation of Apartment Market Research*, at [09:59-10:03], available at https://www.realpage.com/videos/next-generation-apartment-market-research/.

[31] RealPage, *See the Next Generation of Apartment Market Research*, at [12:22-12:50], available at https://www.realpage.com/videos/next-generation-apartment-market-research/.

[32] https://www.realpage.com/storage/files/pages/covid-19-resources/pdf/c19-aso-18-152-011-marketanalyticscampaign-flyer.pdf.

[33] RealPage, *See the Next Generation of Apartment Market Research*, at [02:50-03:03], available at https://www.realpage.com/videos/next-generation-apartment-market-research/.

50. The Market Analytics platform has an "Auto Select" button. RealPage's own Market Analytics' flyer that boasts: "Rely on our automated **True Comps selection algorithms**, driven by enhanced RealPage Data Science models, that **intelligently select ideal rent comps**[.]"[34]




51. In the above screenshot, the Rent Comps screen renders Subject / Comps / Variance across Effective Rent, Occupancy, % Rent Change, % Occupancy Change, Sales PPU, 5-Yr Avg Occupancy, and 5-Yr Avg Rent Change — with negative variances in **red** (*e.g.*, Occupancy **−0.6**, 5-Yr Avg Rent Chg **−0.9**) and positive variances in green (*e.g.*, Occupancy Change 1.1, or, **2.8** above benchmark, which had a -1.7). These are machine-computed gaps between the subject property and a comp set, on rent *and* occupancy, with the shortfalls flagged.

---

[34] RealPage PDF Flyer, Customized Market Visibility & AI Valuation for Smarter Answers Faster, available at https://www.realpage.com/insights-analytics/market-analytics/?showPdf=true (emphasis added).

52. Market Analytics utilizes "true comps and algorithms informed by our industry-leading revenue management and market analytics solutions."[35]

> Rely on our automated **True Comps** selection algorithms, driven by enhanced RealPage Data Science models, that intelligently select ideal rent comps and sales comps based on property attributes and performance to underwrite and evaluate more deals faster.[36]

53. RealPage says that: "asset classification grading … now is aligned between all the RealPage products, and that is also true with the submarket boundaries aligning with many of our other RealPage products which many of you use. And of course integration with our daily lease transactional benchmarking platform. **You can see your portfolio against … a lease transaction peer set, updated every single night**."[37]

54. The Market Analytics Map view also shows red/green directional indicators on Effective Rent, Effective RPSF, and Occupancy for named competitor properties, plus an "A" or "A+" score. The screen below also shows "Concession ($): $115" for that specific property. "In multifamily real estate, a concession is an incentive offered by a property operator to encourage a renter to sign a new lease within a multifamily asset."[38] Concessions are a tool landlords used to increase their rental prices over time while seeming like a good deal. "At first glance, rent

---

[35] Video describing Market Analytics available on realpage.com/insights-analytics/market/-analytics/ as of Sep. 2, 2026.

[36] RealPage PDF Flyer, Customized Market Visibility & AI Valuation for Smarter Answers Faster, available at https://www.realpage.com/insights-analytics/market-analytics/?showPdf=true.

[37] RealPage, *See the Next Generation of Apartment Market Research*, at [05:32-5:54], available at https://www.realpage.com/videos/next-generation-apartment-market-research/.

[38] https://www.northmarq.com/insights/knowledge-center/what-are-multifamily-concessions-and-how-do-they-impact-value-and.

concessions look like an attractive offer, … [but] ‘[m]ost of these costs are hidden until it’s time to extend the lease.’ For example, you can get two months rent-free on a $1,500 apartment, which sounds great up front, but, … ‘[l]andlords tend to increase the lease renewal rent due to the losses incurred, and it is always above the market price.’”[39]




///

///

///

///

///

///

///

///

[39] https://finance.yahoo.com/news/5-downsides-rent-concessions-could-150034396.html




### E. Market Analytics Was Designed for Property Managers and Owners Like Defendant

55. RealPage designed Market Analytics software for, *inter alia*, "Property Managers" like Defendant in the "multifamily industry, providing robust and granular market intelligence for a wide range of property types, including conventional apartments"[40] like Plaintiff's multifamily residential apartment unit.

56. Market Analytics is used by "Property Managers" and "Property Owners."

///

///

///

///

///

///

[40] REALPAGE, MARKET ANALYTICS, *Frequently Asked Questions*, https://www.realpage.com/insights-analytics/market-analytics/ (last accessed June 29, 2026).




57. RealPage created Market Analytics after acquiring Axiometrics and Rentlytics.

58. RealPage acquired Axiometrics in 2017 for $75 million and acquired Rentlyics in 2018 for $57 million. Rentlytics was building a data aggregation and business intelligence system and had over approximately one million clients or units on its system before RealPage bought them.[41] Axiometrics was a provider of apartment market data.

59. Market Analytics is the next generation of Axiometrics. "'The acquisition of Axiometrics furthers our goal to become the definitive source for accurate data intelligence regarding the … operation … of every market-rate apartment in the U.S.,' said Steve Winn, Chairman and CEO of RealPage."[42] Market Analytics launched

---

[41] RealPage, *See the Next Generation of Apartment Market Research*, at [00:45-01:05], available at https://www.realpage.com/videos/next-generation-apartment-market-research/.

[42] https://www.realpage.com/analytics/axiometrics-to-be-acquired-by-realpage-merge-with-mpf-research/

officially in 2019 at the RealWorld conference in Orlando, Florida. RealPage planned on "moving every single Axiometric customer moved over to Market Analytics[.]"[43]

60. As discussed in more detail below, RealPage made enhancements into Axiometrics (or "Axio"). These enhancements include but are not limited to an "[e]xpanded dataset of professionally managed apartments[,]" "[m]ore granular submarket boundaries[,]" "[e]nhanced asset classification grading[,]" and "[i]ntegration into lease-transaction Benchmarking[:]"




*Image taken from RealPage Market Analytics video*
*https://www.realpage.com/videos/next-generation-apartment-market-research/*

61. Market Analytics has been continuously developed since its launch. Per Justin, "We have big teams … working … to continue to enhance the platform."[44]

///

///

---

[43] RealPage, *See the Next Generation of Apartment Market Research*, at [23:37-23:45], available at https://www.realpage.com/videos/next-generation-apartment-market-research/.

[44] RealPage, *See the Next Generation of Apartment Market Research*, at [21:22-21:30], available at https://www.realpage.com/videos/next-generation-apartment-market-research/.

## III. UDR Investor Materials Show It Used Axiometrics

62. As explained above, RealPage acquired Axiometrics and its plan was to move every single Axiometric customer over to Market Analytics.

63. A 2022 UDR investor presentation slide titled "YTD market rent growth of +4.5% is 90bps stronger than typical[.]"

64. It goes on to say: "YOY Effective Blended Lease Rate Growth and Loss-to-Lease by Region" and its source is Axiometrics: "**Source**: ... **AxioMetrics**[.]"[45]




## IV. Defendant Admits It Used RealPage Software

65. UDR has admitted in antitrust litigation that it uses RealPage software.

66. For example, in Defendant UDR, Inc.'s Answer to the District of Columbia's First Amended Complaint in and Affirmative Defenses in *District of Columbia vs. RealPage, Inc. et al.*, No. 2023-CAB-006762 (D.C. Super. Ct. Jan. 22, 2025):

---

[45] Available at https://web.archive.org/web/20220701233524/https://s27.q4cdn.com/542031646/files/doc_presentations/2022/05/UDR-June-2022-Investor-Presentation.pdf.

> UDR further admits that it has used YieldStar as one tool among others to help with UDR's independent decision-making concerning the management of certain of its multifamily units during the past four years, … UDR further admits that it signed a One Master Agreement with RealPage dated April 15, 2017. (*Id.* ¶ 24).
>
> UDR admits that it has used YieldStar as one tool among others to help with UDR's independent decision-making concerning the management of certain of its multifamily units, …. (*Id.* ¶ 72).

67. As of 2024, RealPage products were used in various metropolitan areas including San Diego:

**Figure 1. RealPage Rental Pricing Software Usage: Share of Multifamily Rental Units by Metro in 2023**




Council of Economic Advisers
Sources: RealPage, American Housing Survey, American Community Survey; CEA calculations.
Note: Multifamily units are in buildings with at least five units. Each label refers to a metropolitan statistical area (MSA). "Other MSAs" is defined as average over all MSAs not listed above.
*As of December 12, 2024 at 8:00am.*

*As of December 12, 2024 at 8:00am.*

## V. The Use of Algorithmic Devices to Set Rents or Occupancy Levels Harms San Diego Tenants

68. As the City and County of San Diego has recognized, the use of algorithmic rent devices to set rents or occupancy levels harms San Diego tenants.

69. Economists and regulators agree that the use of algorithmic devices causes economic and social harm.

70. Economists find that RealPage algorithmic software inflates rental prices. The Council of Economic Advisers to the Biden administration quantified that algorithmic pricing in rental housing increased costs to San Diego renters by $99 per month on average.[46]

**Figure 2. Average Monthly Cost of Price Coordination for Units using RealPage Software in 2023**




**Council of Economic Advisers**
Sources: American Housing Survey, American Community Survey, RealPage, *Calder-Wong and Kim (2024)*, Zillow Observed Rent Index; CEA calculations.
Note: Each observation is a Metropolitan Statistical Area (MSA). Average is over units using AIRM/YieldStar software and LRO software. "Other MSAs" is defined as average over all MSAs not listed above.
*As of December 12, 2024 at 8:00am.*

71. Additionally, the White House said:

> We find that … algorithmic pricing cost[s] renters in algorithm-utilizing units $70 a month, or 4% of rent, on average nationally. In six major metros, the cost exceeds $100 a month. Monthly

[46] Council of Economic Advisers, *The Cost of Anticompetitive Pricing Algorithms in Rental Housing*, THE WHITE HOUSE (Dec. 17, 2024), available at https://bidenwhitehouse.archives.gov/cea/written-materials/2024/12/17/the-cost-of-anticompetitive-pricing-algorithms-in-rental-housing/.

> costs … for units using RealPage software by metro are shown in Figure 2. The total cost to renters in 2023 was approximately $3.8 billion.[47]

72. The use of algorithmic devices in setting rent and occupancy levels can further social harms that pervade the housing market, including but not limited to discrimination:

> Mounting evidence reveals that algorithmic decisions can produce biased, discriminatory, and unfair outcomes in a variety of high-stakes economic spheres including employment, credit, health care, and housing.[48]

73. For example, former FTC Commissioner Rebecca Kelly Slaughter notes that AI has led to proxy discrimination, or, "the use of facially neutral factors that generate discriminatory results[.]"[49] "Facebook's use of Lookalike Audiences that facilitated housing discrimination presents one of the clearest illustrations of proxy discrimination."[50]

74. "This problem may persist across … algorithms"[51] including the RealPage algorithmic software at issue here.

75. This is especially so where the RealPage algorithmic software captures niche, granular insights and lease details. "[A]lgorithms … bring the risk of perpetuating or even amplifying longstanding patterns of housing-related

---

[47] *Id.*

[48] Rebecca Kelly Slaughter (with J. Kopec and M. Batal), *Algorithms and Economic Justice: A Taxonomy of Harms and a Path Forward for the Federal Trade Commission*, YALE INFORMATION SOCIETY PROJECT | YALE JOURNAL OF LAW & TECHNOLOGY VOL. 23. (Aug. 2021), at 3, available at https://law.yale.edu/sites/default/files/area/center/isp/documents/algorithms_and_economic_justice_master_final.pdf (internal citation omitted).

[49] *Id.* at 23.

[50] *Id.* at 21.

[51] *Id.* at 22.

discrimination."[52]

## CLASS ALLEGATIONS

76. Plaintiff seeks to represent a class defined as:

> All persons who rented apartments from Defendant in San Diego during the class period (the "Class").

77. Plaintiff reserves the right to modify the Class definition, including by using subclasses, as appropriate based on further investigation and discovery obtained in the case.

78. The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after considering of any tolling, concealment, and accrual issues, and ending on the date of entry of judgement.

79. The following people are excluded from the Class: (1) any Judge presiding over this action and members of her or her family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest (including current and former employees, officers, or directors); (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

80. **Numerosity/Ascertainability:** Members of the Class are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiff at this time; however, it is estimated that

---

[52] Foggo, V., & Villasenor, J., Abstract for *Algorithms, Housing Discrimination, and the New Disparate Impact Rule*, 22 SCIENCE AND TECHNOLOGY LAW REVIEW (2021), available at https://journals.library.columbia.edu/index.php/stlr/article/view/7963.

there are hundreds of individuals in the Class. The identity of such membership is readily ascertainable from Defendant's records and non-party records, such as those of RealPage.

81. **Typicality:** The claims of the named Plaintiff are typical of the claims of the Class because the named Plaintiff, like all other class members, had the rental rate or occupancy level of their residential rental property set using an algorithmic device.

82. **Adequate Representation:** Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members. Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Class. Plaintiff is represented by attorneys with experience in the prosecution of complex class action litigation generally, and in litigation concerning unfair and anti-competitive practices specifically. Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the members of the Class.

83. **Commonality and Predominance:** There are well-defined common questions of fact and law that exist as to all members of the Class and that predominate over any questions affecting only individual members of the Class. These common legal and factual questions, which do not vary between members of the Class, and which may be determined without reference to the individual circumstances of any Class member, include, but are not limited to, the following: whether Defendant violated San Diego Mun. Code § 98.1103(b), whether Defendant uses nonpublic competitor data, and whether Plaintiff and the proposed Class members are entitled to damages, reasonable attorneys' fees, prejudgment interest and costs of this suit.

84. **Superiority:** Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence,

effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### COUNT I

### Violation of San Diego Mun. Code c. 9, § 98.1103(b)

85. Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the members of the Class.

86. The San Diego Municipal Code makes it "unlawful for a landlord to use an algorithmic device to set rental rates or occupancy levels for residential rental property." San Diego Mun. Code § 98.1103(b).

87. In San Diego Mun. Code § 98.1102, a "landlord has the same meaning as in San Diego Municipal Code section 98.0702[.]" And per San Diego Mun. Code § 98.0702: "Landlord means an owner and any person, acting as principal or through an agent, who has the right to offer residential rental property for rent, and includes a predecessor in interest to the landlord."

88. Defendant UDR is a landlord because it has the right to offer UDR-managed property for rent.

89. San Diego Mun. Code § 98.1102 defines an "[a]lgorithmic device" as follows:

> [A] software or product that uses or incorporates one or more algorithms to perform calculations of nonpublic competitor data of two or more landlords to advise a landlord on, or recommend to a landlord, rental rates or occupancy levels that may be

> achieved for a residential rental property in the City of San Diego.

90. The RealPage Market Analytics software uses one or more algorithms to advise Defendant on setting rent and/or occupancy.

91. At all times relevant hereunder, Defendant used RealPage Market Analytics to set rental rates or occupancy levels for residential rental property in San Diego, including Plaintiff's property.

92. San Diego Mun. Code § 98.1102 defines "[n]onpublic competitor data" as follows:

> [I]nformation that is not available to the general public, whether the information is attributable to a specific competitor or anonymized or whether the information is derived from or otherwise provided by another person. Nonpublic competitor data includes information about actual rental rates, rental rate changes, residential rental property supply levels, occupancy levels, or lease start and end dates.

93. The RealPage Market Analytics software uses one or more algorithms to perform calculations of nonpublic, proprietary data.

94. Under the Municipal Code, "[a] tenant may seek injunctive relief, damages, or civil penalties of up to $1,000 per violation of this Division, in a civil action against a landlord." San Diego Mun. Code § 98.1104(a).

95. "For *each month* a violation of section 98.1103(b) exists or continues, and for each residential rental property a landlord uses an algorithmic device, it shall constitute a *separate and distinct violation*." *Id.* § 98.1103(b) (emphasis added).

96. In violation of the San Diego Municipal Code, Defendant used one or more RealPage algorithmic device(s) when setting rents or occupancy levels for Plaintiffs' and Class Members' residential dwelling units in San Diego.

97. Pursuant to San Diego Mun. Code § 98.1104, Plaintiff and Class Members seek (1) injunctive relief, (2) damages, (3) civil penalties of up to $1,000 per violation; and (4) costs and reasonable attorneys' fees.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a. For a determination that this action is a proper class action;

b. For an order certifying the Class, naming Plaintiff as representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

c. For an order declaring that Defendant's conduct violates the statute referenced herein;

d. For an order enjoining the illegal acts detailed herein;

e. For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

f. For an award of compensatory damages, including statutory damages where available, to Plaintiff and Class Members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial;

g. For prejudgment interest on all amounts awarded;

h. For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit; and

i. For an order granting Plaintiff and Class Members such further relief as the Court deems appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated: October 13, 2026

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ L. Timothy Fisher*

L. Timothy Fisher (State Bar No. 191626)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com

**BURSOR & FISHER, P.A.**
Yitzchak Kopel (*pro hac vice*)
1330 Avenue of the Americas,
32nd Floor New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: ykopel@bursor.com

*Attorneys for Plaintiff*